NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

WYATT SIEGAL, *Plaintiff/Appellee,*

*v.*

STEVE A. SIMONS, JR., *Defendant/Appellant.*

No. 1 CA-CV 22-0170
FILED 12-15-2022

Appeal from the Superior Court in Maricopa County
No.  CV 2021-010512
The Honorable Randall H. Warner, Judge

**AFFIRMED**

COUNSEL

Brentwood Law Group PLLC, Tempe
By Stephen Brower
*Counsel for Defendant/Appellant*

Iannitelli Marcolini PC, Phoenix
By Claudio E. Iannitelli, Kyle J. Kopinski
*Counsel for Plaintiff/Appellee*

---

**MEMORANDUM DECISION**

Judge Jennifer B. Campbell delivered the decision of the Court, in which Presiding Judge Brian Y. Furuya and Judge Paul J. McMurdie joined.

---

**C A M P B E L L**, Judge:

¶1         Steve Simons, Jr., appeals the superior court's denial of his motion to dismiss Wyatt Siegal's complaint and compel arbitration. Simons contends the superior court erred in deciding the threshold question of arbitrability rather than allowing the arbitrator to make that determination and by holding that the arbitration clause in the parties' Operating Agreement did not extend to the debt collection action premised on a subsequent Transfer Agreement. Because we agree that an arbitration clause does not govern the parties' dispute, we affirm.

**BACKGROUND**

¶2         Siegal, Simons, and non-party Shane Freitas were members of Paramount Recovery Services ("PRS"), a limited liability company. In 2017, the three members entered into the Operating Agreement to "provide for the governance of [PRS] and the conduct of its business and to specify their relative rights and obligations in relation thereto." This agreement included an arbitration clause for all disputes between members and managers of the LLC.

¶3         In May 2020, Simons expressed interest in buying Siegal's 80% membership interest in PRS. Siegal contends the parties then entered into a Transfer Agreement, in which Siegal would transfer his interest to Simons in exchange for $293,000. Under the Transfer Agreement, when the sale closed, Siegal would "have no further rights as a Member in the Company" and would resign from PRS. According to Siegal, Simons executed and approved the Transfer Agreement.

¶4         Simons claims he never signed the Transfer Agreement, but made payments to Siegal totaling $187,833.24, in accordance with the terms of the Transfer Agreement in May and June 2020. Simons also filed "Articles of Amendment to Articles of Organization for PRS" with the Arizona Corporation Commission, "removing Wyatt Siegal as a member" in July 2020. Simons then stopped making payments.

¶5            In July 2021, Siegal filed a complaint alleging breach of contract and unjust enrichment.[1] Simons moved to dismiss the complaint and compel arbitration, arguing that this dispute fell under the arbitration clause in the Operating Agreement. At oral argument in the trial court, Simons also argued that Section 8.1 of the Operating Agreement required a member to provide formal notice of dissociation and wait 180 days—until the notice requirement had been met, a member was still bound by the Operating Agreement, including its mandatory arbitration provision.

¶6            Siegal argued that his claims did not arise out of the Operating Agreement but out of the Transfer Agreement since all issues related to the transfer of his interest in PRS to Simons. Siegal asserted the Transfer Agreement did not have an arbitration clause and instead specified it should "be construed according to the laws of the State of Arizona."

¶7            After oral argument, the superior court denied Simons' motion to dismiss and compel arbitration. The court found that the dispute arose from the Transfer Agreement, not the Operating Agreement. The superior court found Siegal was no longer a member or manager of PRS after the execution of the Transfer Agreement and was no longer bound by the arbitration requirement set out in the Operating Agreement. The court also found that the notice requirements in Section 8.1 of the Operating Agreement did not apply because it concerned voluntary dissociation from the LLC and not a transfer of membership interests.

¶8            Simons timely appealed the superior court's decision denying his motion to dismiss and compel arbitration.

## DISCUSSION

¶9            Simons argues the superior court erred in (1) holding the arbitration provision did not apply to Siegal, (2) deciding arbitrability rather than leaving this to an arbitrator, and (3) interpreting the Operating Agreement to mean it did not apply to Siegal's transfer of membership interest.

¶10           We review the denial of a motion to compel arbitration de novo. *Sun Valley Ranch 308 Ltd. P'ship ex rel. Englewood Props., Inc. v. Robson*, 231 Ariz. 287, 291, ¶ 9 (App. 2012). The interpretation of a contract is an issue of law that we also interpret de novo. *Grosvenor Holdings, L.C. v.*

---

[1] Siegal also sued PRS on other grounds not at issue in this appeal. PRS is not a party to this appeal.

*Figueroa*, 222 Ariz. 588, 593, ¶ 9 (App. 2009). "The purpose of contract interpretation is to determine the parties' intent and enforce that intent." *Id.* We look first to "the plain meaning of the words in the context of the contract as a whole,]" and if the parties' intent is clear and unambiguous, we apply the language as written. *Id.*

## I.     Siegal's Obligations Under the Operating Agreement Terminated Upon Execution of the Transfer Agreement

¶11       Simons argues the superior court erred in determining that Siegal was not bound by the arbitration requirements in the Operating Agreement. He argues that the arbitration clause is broad enough to cover the dispute because it requires the Operating Agreement's signers to "resolve disputes . . . by or against any Manager or Member" through binding arbitration.

¶12       Simons ignores the change in Siegal's membership status when he filed his complaint. The Transfer Agreement and subsequent filing of the Amended Operating Agreement terminated Siegal's member status. "[A] contract is superseded by a subsequent agreement concerning the same subject matter . . . if that result is intended by the parties," and that intent "must be established by clear and satisfactory proof." *Ft. Mohave Farms, Inc. v. Dunlap*, 96 Ariz. 193, 196 (1964). If the later contract's effect on the previous contract is not expressly stated, "it is to be determined from the implications contained in the instruments and the relevant circumstances which aid interpretation." *Id.*

¶13       Even though the Transfer Agreement does not clarify its effect on the Operating Agreement, it provides that effective upon closing, Siegal "will have *no further rights* as a Member in the Company, and immediately prior to the execution of this Agreement, [Siegal] will resign from the LLC." (Emphasis added.) Therefore, the execution of the Transfer Agreement effectively ended Siegal's member status and the accompanying rights and obligations. This necessarily terminated Siegal's agreement to arbitrate disputes under the Operating Agreement.

¶14       Simons points out he did not sign the Transfer Agreement, and to the extent that he believes he is not bound by its terms, we disagree. "Acceptance of an offer may be implied from acts or conduct." *In re Mariotte's Est.*, 127 Ariz. 291, 292 (App. 1980). His actions in filing the Amended Articles and making payments under the Transfer Agreement belie any assertion that he is not bound by the agreement. Simons affirmed the Transfer Agreement by filing Amended Articles of Incorporation with

the Arizona Corporation Commission, removing Siegal as a member of the LLC. It is undisputed that Simons partially performed his obligations under the Transfer Agreement by paying Siegal nearly two-thirds of the agreed-upon price for Siegal's membership interest. It is also undisputed that Simons accepted the benefits of the Transfer Agreement by taking possession and control of Siegal's PRS membership interest. Simons' actions both affirmed his acceptance of the terms of the Transfer Agreement and that Siegal was no longer a PRS member bound by the Operating Agreement's arbitration clause.

## II. Siegal's Claims Arise Solely Out of Obligations Under the Transfer Agreement

¶15 Simons argues that the Operating Agreement and the Transfer Agreement are sufficiently related documents "such that Simons could compel arbitration of disputes related to the Transfer Agreement under the Operating Agreement's broad arbitration clause." *See Sun Valley Ranch*, 231 Ariz. at 291, ¶¶ 16-17 (holding that an agreement's broad arbitration clause covered disputes under a different agreement when the two were inter-related and inter-dependent).

¶16 But the Transfer Agreement is simply an agreement to purchase Siegal's interest in PRS under the Operating Agreement; it does not alter or amend the interests of the members and managers. The independent nature of the interests addressed in each agreement is also evidenced by the need for filing the Amended Operating Agreement removing Siegal from PRS as a member.

¶17 Simons argues that one general reference to the Operating Agreement in the Transfer Agreement's recitals and two specific references to certain provisions in the Operating Agreement make the two sufficiently related. We disagree. The reference to the Operating Agreement in the Transfer Agreement's recitals cannot be used to extend an arbitration requirement. *See Fugate v. Town of Payson*, 164 Ariz. 209, 211 (1990) ("When the recitals are broader than a contract's operative clauses, the recitals cannot be used to extend or broaden the restrictions contained in the body of the agreement.") The Transfer Agreement's two specific references to paragraph 5.4 (regarding members' compensation for services) and Section 8.2.1 (regarding restrictions on share transfers) of the Operating Agreement only incorporate the Operating Agreement terms for those specific purposes. *See United Cal. Bank v. Prudential Ins. Co. of Am.*, 140 Ariz. 238, 259 (App. 1983) ("A reference made for a particular purpose, which purpose is clear from the contract, will operate to incorporate the document only for

that particular purpose.") The Operating Agreement's arbitration clause is not referenced or incorporated within the Transfer Agreement by the references to other provisions of the Operating Agreement. *See id.* The Transfer Agreement also included an incorporation clause, which states: "This Agreement constitutes the entire agreement of the parties pertaining to the transfer of the Interest by the Seller and supersedes all prior and contemporaneous agreements, representations, and understandings of the parties with respect to such transfer."

**¶18**         In sum, the Transfer Agreement is the only contract that governs this dispute, and it does not include an arbitration requirement.[2] For that reason, the superior court correctly denied Simons' motion to dismiss and compel arbitration.

## CONCLUSION

**¶19**         For the above reasons, we affirm. Simons requests an award of attorney's fees and costs under A.R.S. §§ 12-341, -342, and -341.01.  Siegal also requests an award of attorneys' fees and costs under A.R.S. § 12-341.01. Under A.R.S. § 12-341.01, a court may award attorneys' fees to the prevailing party in a dispute that arises out of a contract. As the prevailing party, we grant Siegal's request for reasonable attorneys' fees and taxable costs on appeal upon compliance with ARCAP 21.



AMY M. WOOD • Clerk of the Court
FILED:    AA

---

[2] Because the Operating Agreement does not govern this dispute, we need not address Simons' arguments about arbitrability or the interpretation of Section 8.1 of the Operating Agreement.